**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 4KIDS ENTERTAINMENT, INC., *et al.*,[1] | ) | Case No.: 11-11607 (SCC) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF BRUCE R. FOSTER IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS AND IN COMPLIANCE WITH LOCAL RULE 1007-2

I, Bruce R. Foster, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury as follows:

1.     I am the Executive Vice President and Chief Financial Officer of 4Kids Entertainment, Inc. ("4Kids Entertainment"), a New York corporation (collectively with their debtor affiliates herein, the "Debtors", and collectively with their debtor and non-debtor[2] affiliates, "4Kids").  With the exceptions noted below, all subsidiaries of 4Kids Entertainment are wholly-owned and are debtors in these cases.  I have worked for 4Kids since 2002, and am familiar with the day-to-day operations, businesses and financial affairs of the Debtors.

2.     I submit this declaration (this "Declaration") in support of the First Day Motions (defined herein) pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

---

[1]     The Debtors, along with the last four digits of each Debtor's federal tax identification number, are:  4Kids Entertainment, Inc. (1380); 4Kids Ad Sales, Inc. (6309); 4Kids Digital Games, Inc. (7645); 4Kids Entertainment Home Video, Inc. (0094); 4Kids Entertainment Licensing, Inc. (3342); 4Kids Entertainment Music, Inc. (6311); 4Kids Productions, Inc. (3593); 4Kids Technology, Inc. (8181); 4Kids Websites, Inc. (7563); 4Sight Licensing Solutions, Inc. (8897); The Summit Media Group, Inc. (2061); and World Martial Arts Productions, Inc. (8492).

[2]     There are three non-debtor affiliates (discussed below):  4Kids Entertainment International, Ltd., a U.K. entity, and TC Digital Games LLC and TC Websites LLC, both Delaware limited liability companies.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York.   The Debtors are seeking entry of an order directing that these chapter 11 cases be jointly administered for procedural purposes.  The Debtors are continuing to operate their businesses and manage their properties as debtors in possession.

4.      To enable the Debtors to operate effectively and minimize the potential adverse effects of the commencement of these chapter 11 cases, the Debtors have requested certain relief in a limited number of "first day" motions filed with the Court (collectively, the "First Day Motions").  Among other things, the First Day Motions seek relief that would (i) ensure the continuation of the Debtors' cash management system and other business operations without interruption, (ii) maintain employee morale and confidence, and (iii) establish administrative procedures to promote a seamless transition into chapter 11.

5.      I am generally familiar with the contents of each First Day Motion and believe that the relief sought therein is necessary for the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value and to prevent immediate and irreparable harm to the Debtors' estates.  I believe that the relief sought in the First Day Motions is in the best interest of the Debtors, their estates, their creditors, and other parties in interest.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, were learned from my review of relevant documents, or are my opinion based upon my experience and knowledge of the Debtors' operations and

financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this Declaration.

7. Part I of this Declaration describes the Debtors' business, capital structure, and the circumstances leading to the filing of these chapter 11 cases. Part II sets forth the relevant facts in support of the First Day Motions. Part III provides the additional information about the Debtors that I understand is required by Local Rule 1007-2(a) and (b).

## I. THE DEBTORS' BUSINESS, CAPITAL STRUCTURE, AND THE CIRCUMSTANCES LEADING TO THE CHAPTER 11 FILING

### A. The Debtors' Business

8. 4Kids is a diversified entertainment and media company specializing in the youth oriented market, with operations in the following business segments: (i) licensing, (ii) advertising and media broadcast, and (iii) television and film production/distribution. The parent entity, 4Kids Entertainment, was organized as a New York corporation in 1970.

*Licensing*

9. The licensing business segment is conducted through the operations of the following four wholly-owned subsidiaries of 4Kids Entertainment:

a. Debtor 4Kids Entertainment Licensing, Inc. ("4Kids Licensing"), a New York corporation, is engaged in the business of licensing the merchandising rights to popular children's television series, properties and product concepts (collectively, the "Properties"). 4Kids Licensing typically acts as exclusive merchandising agent in connection with the grant to third parties of licenses to manufacture and sell all types of merchandise, including toys, videogames, trading cards, apparel, housewares, footwear, books and other published materials, based on such Properties.

b.    Debtor 4Sight Licensing Solutions, Inc. ("4Sight Licensing"), a Delaware corporation, is engaged in the business of licensing properties and product concepts to adults, teens and "tweens."  It focuses on brand building through licensing.

c.    Debtor 4Kids Technology, Inc. ("4Kids Technology"), a Delaware corporation, develops ideas and concepts for licensing which integrate new and existing technologies with traditional game and toy play patterns.

d.    Non-debtor 4Kids Entertainment International, Ltd. ("4Kids International"), an entity formed under U.K. law and based in London, manages Properties represented by 4Kids in the U.K. and European markets.

10.    The licensing segment accounted for approximately 83% of 4Kids' consolidated net revenues for the year ended December 31, 2010.[3]

*Advertising Media and Broadcast*

11.    4Kids Entertainment, through a multi-year agreement with The CW Network, LLC ("The CW"), leases The CW's Saturday morning programming block ("The CW4Kids Block"), which broadcasts in most markets from 7 a.m. to 12 p.m.  The initial term of the agreement is five years, which began with The CW's 2008-2009 broadcast season.  4Kids provides substantially all programming content to be broadcast on The CW4Kids Block.

12.    Debtor 4Kids Ad Sales, Inc. ("4Kids Ad Sales"), a Delaware corporation, sells network advertising time during The CW4Kids Block.  Debtor The Summit Media Group, Inc., a New York corporation that terminated its operations effective June 30, 2006, previously provided print and broadcast media planning and buying services for clients principally in the children's toy and game business.  Debtor World Martial Arts Productions, Inc., a New York

---

[3]    The consolidated revenues reflected in this Declaration are inclusive of non-debtor affiliates.

corporation that terminated its operations between 1996 and 1997, previously produced a live-action martial arts competition series of programs called WMAC Masters.

13.     The advertising media and broadcast segment also generates revenues from the sale of advertising on 4Kids' multiple websites.  These websites showcase and promote The CW4Kids Block and other 4Kids' Properties.

14.     The advertising media and broadcast segment accounted for approximately 6% of 4Kids' consolidated net revenues for the year ended December 31, 2010.

*Television and Film Production/Distribution*

15.     The television and film production/distribution business segment is conducted through the following three wholly-owned subsidiaries of 4Kids Entertainment:

a.     Debtor 4Kids Productions, Inc. ("4Kids Productions"), a New York corporation, produces and adapts animated and live-action television programs and theatrical motion pictures for distribution to the domestic and international television, home video and theatrical markets.

b.     Debtor 4Kids Entertainment Music, Inc. ("4Kids Music"), a Delaware corporation, composes original music for incorporation into television programming produced by 4Kids Productions and markets and manages such music.

c.     Debtor 4Kids Entertainment Home Video, Inc. ("4Kids Home Video"), a Delaware corporation, distributes home videos associated with television programming produced by 4Kids Productions.

16.     The Properties associated with this business segment include broadcasts of "Dinosaur King", "Yu-Gi-Oh!," "Sonic X" and "Chaotic."

17.     The television and film production/distribution segment accounted for approximately 11% of 4Kids' consolidated net revenues for the year ended December 31, 2010.

**B.      Capital Structure**

18.     4Kids Entertainment is a public company with approximately 250 to 300 known common stockholders.  The common stock is traded on the over-the-counter market.

19.     The Debtors have no outstanding bank loans, bonds or other similar instruments and are funding their activities with cash from operations.

20.     The CW has a security interest in proceeds arising out of the broadcast of national television commercials during The CW4Kids Block.  Under the terms of The CW-4Kids Entertainment Saturday Morning Programming Block Term Sheet, dated June 23, 2010, The CW and 4Kids Entertainment have designated The Bank of New York Mellon as paying agent to which proceeds derived from the sale of national advertising during The CW4Kids Block are paid.  On a weekly basis, The Bank of New York Mellon remits to each of The CW and 4Kids Entertainment their respective shares of the national advertising proceeds.

**C.      Circumstances Leading To Chapter 11 Filing**

*Dispute Regarding the Yu-Gi-Oh! License*

21.     The principal driver for filing these cases is the need to protect 4Kids' most valuable asset -- its rights under an exclusive license relating to the popular Yu-Gi-Oh! ("YGO") series of animated television programs -- from efforts by the licensor, a consortium of Japanese companies, to wrongfully terminate the license and force 4Kids out of business.

22.     The terms of the license are set forth in the Amended and Restated Yu-Gi-Oh! Agreement, by and among Television Tokyo Channel 12, Ltd. 4 and Nihon Ad Systems, Inc. c/o Asatsu-DK Inc. ("ADK"), as licensors, and 4Kids Entertainment, as licensee.

23.     During 2010, ADK conducted an audit of the books and records of 4Kids. ADK's auditor made a preliminary and, in my view, unsubstantiated determination that 4Kids owes ADK roughly $4.8 million under the YGO license.[4]

24.     4Kids <u>vigorously</u> disputes ADK's audit claims and has provided ADK and its counsel with substantial evidence refuting the various ADK audit claims.

25.     In February 2011, 4Kids and ADK met several times with ADK and/or its counsel in an effort to resolve the audit dispute. Following those meetings, ADK advised 4Kids that it would not engage in any further discussions unless 4Kids paid ADK "a seven-figure sum" to be applied against ADK's audit claim. On March 17, 2011, in response to ADK's demand, 4Kids wired $1 million to ADK as a good faith effort to facilitate a settlement of the audit dispute, while reserving its position that ADK was not entitled to that amount.[5]

26.     4Kids and ADK met again on Friday March 18, 2011 to attempt to resolve the audit dispute. The March 18, 2011 meeting was unsuccessful. The March 18, 2011 meeting was followed up by a letter sent by 4Kids' counsel to ADK's counsel on Sunday, March 20, 2011 and by a letter sent by members of the 4Kids' Board of Directors to executives at ADK seeking to resolve the audit dispute. The March 20, 2011 letter from 4Kids' counsel to ADK's counsel states what had previously been discussed with ADK's counsel: if ADK sent the 10

---

[4]     It appears from the lawsuit recently filed by ADK (discussed below) the ADK auditor issued his "final confidential report" on November 17, 2010. This audit report has never been shared with 4Kids although it is customary in the merchandise licensing industry to provide the audit report to the audited party. It also appears from the ADK lawsuit that ADK has reduced the amount of its claim against 4Kids to roughly $4.1 million, although it is in no way clear from the lawsuit the reason for the reduced amount. ADK's audit claim generally consists of (a) a share of home video revenues that ADK contends were never reported by 4Kids (in the range of $2.1 million), (b) foreign taxes withheld and paid by 4Kids that ADK contends were not properly substantiated (in the range of $2.3 million), (c) certain amounts charged by 4Kids (audit fees, insurance costs, bank charges, and art and dubbing fees) that ADK alleges were not expressly authorized by the terms of the YGO license (approximately $220,000), and (d) material and courier costs for which ADK claims it was entitled to reimbursement but was never reimbursed (approximately $248,000).

[5]     In addition to the amounts owed to 4Kids under the YGO license, 4Kids has a bona fide claim to recover, as a preferential transfer, $1 million it wired to ADK three weeks prior to filing these cases.

business day notice of termination provided for in paragraph 12 of the YGO license, 4Kids would have no choice but to file for bankruptcy which would "stay" the 10 business day notice of termination.

27.     On March 25, 2011, ADK, in blatant disregard of the 10 business day notice requirement set forth in the YGO license, sent a letter to 4Kids purporting to terminate the YGO license on the grounds that the audit claims had not been resolved to ADK's satisfaction. In addition, on or about March 25, 2011, ADK filed suit against 4Kids in the United States District Court for the Southern District of New York, TV Tokyo Corp. v. 4Kids Entertainment, Inc., No. 11 CV 2069 (Holwell, J.).  The lawsuit makes various false and malicious allegations against 4Kids designed to further injure the business and reputation of the company.

28.     4Kids disputes that ADK's purported March 25, 2011 termination letter was valid or effective.  As previously noted, ADK failed to comply with the clear termination requirements in the YGO license agreement both (a) by failing to provide effective notice that it intended to terminate as a result of an alleged breach, and (b) by failing to give 4Kids the minimum ten business days, following the initial written notice, to cure the alleged breach.

29.     Even if we assume, for sake of argument, that the March 25 letter constitutes sufficient notice of ADK's intent to terminate thereby triggering the 10 business day cure, such ten-business day cure period would expire no earlier than the close of business on Thursday, April 7, 2011.

30.     Moreover, ADK has no valid basis upon which to terminate the YGO license because ADK's audit claims are largely without merit.  In addition, 4Kids has already paid ADK a $1 million good faith payment in order for ADK to deign to meet with 4Kids.  Also, there is currently a credit balance in favor of 4Kids of an additional $1.1 million representing

advances and other payments previously made by 4Kids to ADK which, under the terms of the YGO license, 4Kids would be able to recoup before any additional monies are payable to ADK. Thus, even in the unlikely event that ADK's purported termination of the YGO license pursuant to the letter of March 25, 2011 is deemed to be in compliance with the YGO license termination provision, 4Kids is not in breach of the YGO license unless the amount owed to ADK under the ADK audit claims is in excess of $2.1 million (the sum of the $1 million good faith payment made by 4Kids to ADK on March 17, 2011 and the $1.1 million credit balance in favor of 4Kids).

31.     4Kids has advised ADK and its counsel of the foregoing.  4Kids has also provided ADK and its counsel with information regarding the extreme harm which ADK's termination of the YGO license will cause to the business of 4Kids.  By way of example, for the year ended December 31, 2010, the revenues generated from the YGO license alone account for approximately 36% of 4Kids' consolidated net revenue.  Those revenue streams will be diminished, if not stopped, by ADK's disregard for 4Kids' rights under the YGO license.  Yet, notwithstanding, the various discussions with ADK and its counsel and the letters outlining the severe damage to 4Kids which would result from ADK's wrongful termination of the YGO license, ADK has refused to rescind the March 25, 2011 letter purporting to terminate the YGO license.

32.     Upon information and belief, ADK is compounding the damages to 4Kids from ADK's purported termination of the YGO license by conducting an active marketing campaign to locate a third party replacement for 4Kids as licensee of the YGO properties.

*General Operating Environment*

33.     4Kids' operating results have been negatively impacted by the decline in licensing revenue from various Properties represented by the company and by the expiration of representation agreements for other Properties which 4Kids had represented for many years. 4Kids also experienced a decrease in television and film revenues relating to its broadcast sales. These declines are generally the result of a decline in the popularity of 4Kids' existing properties and the failure of new properties to achieve similar popularity levels.

34.     In 2009 and 2010, 4Kids implemented significant cost-cutting initiatives, primarily pertaining to personnel and advertising and marketing expenses.

*Discontinued Operations*

35.     4Kids also experienced losses due to recently discontinued operations in the gaming segment. 4Kids Digital Games, Inc. ("4Kids Digital"), a Delaware corporation, owns 55% of TC Digital Games LLC ("TC Digital"), a Delaware limited liability company and non-debtor entity, which produced, marketed and distributed the "Chaotic" trading card game. 4Kids Websites, Inc. ("4Kids Websites"), a Delaware corporation, owns 55% of TC Websites LLC ("TC Websites"), a Delaware limited liability company and non-debtor entity, which owns and operated www.chaoticgame.com, the companion website for the "Chaotic" trading card game. TC Digital and TC Websites are the exclusive licensees of certain patents covering the uploading of coded trading cards to a website where online game play and community activities occur.

36.     TC Digital and TC Websites were not profitable. The operations resulted in significant losses for 4Kids and, effective September 30, 2010, 4Kids terminated the operations of TC Digital and TC Websites due to their continued lack of profitability.

*Liquidity Issues*

37.     In order to fund operating losses and losses related to discontinued operations, 4Kids used substantial amounts of cash and sold certain securities held in its investment portfolio.  While the timing of these sales was not primarily motivated by then current cash needs, without these sales 4Kids would not have had sufficient cash to fund its operations.  In addition to these operating losses, 4Kids' liquidity has also been negatively affected by the limited liquidity of certain securities held in its investment portfolio.

*Seasonal Demand and Competition*

38.     4Kids' revenues are significantly impacted by seasonal trends.  A substantial portion of 4Kids' revenues and net income are subject to the seasonal and trend variations of the toy and game industry.  Typically, a majority of toy orders are shipped in the third and fourth calendar quarters.  Historically, 4Kids' net revenues from toy and game royalties during the second half of the year have generally been greater than during the first half of the year.  Advertising revenues derived from the sale of commercial time on The CW4Kids Block is generally higher in the fourth quarter due to higher advertising rates typically charged to children's advertisers for advertising during the holiday season.

39.     In addition, 4Kids operates in a highly competitive environment and the company competes with large, multinational corporations.  4Kids' principal competitors in the Licensing segment are the large media companies (e.g., Disney, Time Warner and Nickelodeon, which is owned by Viacom) with consumer products/merchandise licensing divisions, toy companies, other licensing companies, and numerous individuals who act as merchandising agents.  4Kids principal competitors in the Advertising Media and Broadcast segment include large media companies (e.g., Disney, Time Warner, CBS, NBC and Nickelodeon, which is

owned by Viacom) with substantially greater resources and distribution networks than 4Kids.

4Kids competitors in the Television and Film Production/Distribution segment include a

significant number of companies that produce and/or broadcast television programming and

distribute theatrical motion pictures and home videos for children's and program websites.

## II.     __FIRST DAY MOTIONS AND FACTS IN SUPPORT THEREOF__[6]

### A.     __Filing of Bankruptcy Case and First Day Motions__

        40.     I understand that on the Petition Date the Debtors filed the following First

Day Motions, among other pleadings:

    A.     Debtors' Motion for an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion");

    B.     Debtors' Motion for an Order (I) Authorizing the Debtors to Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Unsecured Creditors, and (III) Authorizing the Debtors to Send Notices to Creditors (the "Mailing Matrix Motion");

    C.     Debtors' Application For Entry of an Order Authorizing and Approving the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent for The Debtors And Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "Notice and Claims Agent Application");

    D.     Debtors' Motion for an Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures (the "Case Management Motion");

    E.     Debtors' Motion for Interim and Final Orders Approving (I) Continued Use of Debtors' Cash Management System, (II) Continuation of the Intercompany Transactions, (III) Continued Use of the Debtors' Existing Bank Accounts, Checks, and Business Forms, and (IV) Relief from the Bond Requirement Contained in Bankruptcy Code Section 345(b) (the "Cash Management Motion");

---

[6]     Capitalized terms not otherwise defined herein have the meanings ascribed to them in the applicable First Day Motion.

F. Debtors' Motion for Interim and Final Orders (I) Authorizing the Payment of Prepetition Wages and Salaries and the Payment and Honoring of Prepetition Employee Policies and Benefits, and (II) Continuing Employee Wages and Benefits During these Chapter 11 Cases (the "Wages Motion"); and

G. Debtors' Motion for Interim and Final Orders Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and to Maintain Certain Related Programs and Practices in the Ordinary Course (the "Customer Programs Motion").

## A. Joint Administration Motion

41. The Joint Administration Motion seeks an order consolidating the Debtors' cases for administrative purposes only. It seeks permission to treat the Debtors' cases under a single caption and for related relief.

42. Joint administration of the Debtors' cases will eliminate the need for duplicative notices, applications and orders, allowing the Debtors to avoid the time and expense that otherwise would be required to separately administer individual cases. The rights of creditors will not be adversely affected because the Joint Administration Motion seeks only administrative, and not substantive, consolidation of the Debtors' cases. All creditors will benefit from the reduced costs that will result from the joint administration of these cases. The Court will be relieved of the burden of entering duplicative orders and maintaining redundant files, and the amount of resources that the United States Trustee (the "U.S. Trustee") will need to spend supervising these cases will be lessened.

43. I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors' estates, their creditors, and all parties in interest.

## B. Mailing Matrix Motion

44. The Mailing Matrix Motion seeks authority for the Debtors to prepare a list of creditors in lieu of a formatted mailing matrix, for the Debtors to file a consolidated list of

the Debtors' unsecured creditors, and for the Debtors to mail notices through their proposed notice and claims agent (described below).

45.    The Debtors have hundreds of creditors and other interested parties, and converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and greatly increase the risk of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

46.    The Debtors submit that it is more efficient and appropriate to file a list of the Debtors' unsecured creditors on a consolidated basis rather than to file lists for each individual Debtor.  Moreover, as some of the Debtors have no identifiable unsecured creditors, filing separate lists would be of limited utility.

47.    In addition, the Debtors have filed an application to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their notice and claims agent in these chapter 11 cases. Using Epiq for this purpose will maximize administrative efficiency in these chapter 11 cases and reduce the administrative burdens that would otherwise fall upon the Court, the Clerk's Office and the U.S. Trustee.

48.    The relief requested in the Mailing Matrix Motion is necessary and appropriate and is in the best interest of the Debtors' estates, creditors, and other parties in interest.

**C.    Notice and Claims Agent Application**

49.    The Debtors believe that these chapter 11 cases will involve a large number of creditors and other parties in interest to whom certain notices, including the notice of the commencement of these cases and the initial meeting of the Debtors' creditors, must be sent. The numerous creditors and other parties in interest involved in these chapter 11 cases may impose heavy administrative and other burdens on the Court and the Clerk's Office.  To relieve

the Clerk's Office of these burdens, the Debtors seek an order appointing Epiq as the notice and claims agent (the "Claims Agent").

50.     After analyzing proposals from three firms, the Debtors selected Epiq because it is one of the country's leading chapter 11 administrators, with extensive experience in noticing, claims administration, solicitation, and facilitating other administrative aspects of chapter 11 cases.  It has substantial experience in matters of this size and complexity, and it has acted as the official notice and claims agent in many large bankruptcy cases pending in this District and other districts nationwide.  The Debtors believe that Epiq is well qualified to serve in this role

51.     As the Claims Agent, Epiq will, among other things, (i) distribute required notices to parties in interest, (ii) receive, examine, maintain and docket all proofs of claim and proofs of interest filed in these chapter 11 cases and maintain the associated claims registers, and (iii) provide such other administrative services as the Court, the Clerk's Office, and the Debtors may require in connection with these chapter 11 cases.

52.     The retention and employment of Epiq in connection with these chapter 11 cases is in the best interests of the Debtors' estates, creditors, and other parties in interest.

**D.      Case Management Motion**

53.     The Case Management Motion seeks the establishment of certain notice and case management procedures (the "Procedures") intended to avoid unnecessary cost, delay and confusion related to proceedings involving these cases in this Court.

54.     Among other things, the Case Management Motion seeks orders limiting service, in certain circumstances, to the parties most likely to be affected by the noticed actions, permitting email notice in certain instances, and scheduling omnibus hearings at which the Court, the Debtors and other parties in interest can address several motions at once, thereby

avoiding the substantial time and expense of scheduling separate hearings on discrete matters, and avoiding the confusion that could ensue if regularly scheduled hearings were not established. The Case Management Motion also seeks the establishment of procedures both allowing the Debtors to file agendas prior to each omnibus hearing and governing motion practice.

55.     The notice procedures outlined in the Case Management Motion are appropriate because a large number of parties in interest may be entitled to receive notice in these chapter 11 cases.  Providing notice of all pleadings filed to each creditor and party in interest is unnecessary and would be extremely burdensome and costly to the estate, in light of the photocopying, postage, and other expenses associated with such large mailings.

56.     The administration of these chapter 11 cases would be more efficient and cost-effective if the relief requested in the Case Management Motion were granted.  In addition to the discharge of their ordinary duties, the Debtors' personnel now carry the additional burdens imposed by the commencement of these chapter 11 cases.  By authorizing the Debtors to schedule omnibus hearing dates, establishing clear timelines for the filing of requests for relief, and allowing, with certain exceptions, electronic service, such Procedures will assist the Debtors' management in preserving the Debtors' time and directing the attention of their personnel to issues in these chapter 11 cases.

57.     The relief requested in the Case Management Motion is necessary and appropriate and is in the best interest of the Debtors' estates, creditors, and other parties in interest.

## E.     Cash Management Motion

58.     Prior to the Petition Date, the Debtors maintained a cash management system in connection with the day-to-day operation of their business (the "Cash Management

System"). The Cash Management System constitutes a customary and essential business practice and is similar to systems currently utilized by comparable corporate enterprises.

59. Through the Cash Management Motion, the Debtors seek to continue to use the Cash Management System, to engage in certain intercompany transactions (the "Intercompany Transactions"), and to use existing bank accounts, checks, and business forms during these chapter 11 cases. The Debtors believe they are substantially in compliance with section 345 of the Bankruptcy Code but also seek an extension to comply with the bond requirement contained in section 345(b) of the Bankruptcy Code with respect to one bank account.

60. The use of the Debtors' existing Cash Management System provides numerous benefits to the Debtors, including providing them with central management and control of corporate funds, ensuring cash availability and reducing overhead costs by facilitating the movement of funds. Requiring the Debtors to adopt new, segmented cash management systems at this critical juncture would be expensive, create unnecessary administrative burdens, and be disruptive to the operation of the business. In light of the foregoing, maintenance of the existing Cash Management System is not only essential but in the best interests of all creditors and other parties in interest.

61. In the ordinary course of business, the Debtors also engage in Intercompany Transactions, which involve the accounting for various cash receipts and disbursements made by and between the Debtors and their non-debtor affiliates. Each Intercompany Transaction is accounted for through book entries on the appropriate Debtor's, or non-debtor affiliate's, books and records. The continuation of ordinary course Intercompany Transactions is necessary to operate the Debtors' businesses. The Intercompany Transactions

also reduce the administrative costs incurred by the Debtors.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted.

62.     The Debtors utilize sixteen (16) cash accounts at JPMorgan Chase ("JPMorgan") and one (1) investment account at Barclays Wealth ("Barclays").  The Debtors' cash accounts are primarily operating accounts used by the Debtors to, among other thing, remit payments to licensors, agents and employees and to accept payments from vendors and licensees. The Debtors believe that maintaining these Debtors' bank accounts, as part of the Cash Management System, is essential to a smooth and orderly transition into chapter 11.  Permitting existing accounts to remain open would help the Debtors preserve business continuity, as well as avoid the operational and administrative difficulties that closing the accounts and opening new ones would necessarily entail, to the benefit of the Debtors and all parties in interest.

63.     As provided above, all but one of the Debtors' accounts is located at JPMorgan, a financial institution approved by the U.S. Trustee.  The Debtors believe that any funds deposited in those accounts are secure and, thus, the Debtors are in compliance with section 345 of the Bankruptcy Code.  The Debtors also maintain an investment account at Barclays, which currently reflects a zero balance.  Although Barclays is not on the U.S. Trustee's approved list, Barclays is a large and well-known financial institution, and the Debtors believe that any funds deposited at Barclays would be secure.  Nonetheless, the Debtors intend to close the account at Barclays in the near-term.  Out of an abundance of caution, the Debtors seek a 45-day extension of the time to comply with section 345(b) of the Bankruptcy Code in order to ensure that the Debtors are in full compliance with the statute  or are otherwise in agreement with the U.S. Trustee.

64.     In the ordinary course of business, the Debtors use a number of business forms, including pre-printed checks and letterhead.  The Debtors believe that if they were required to obtain new business forms and stationery as a result of the filing of these chapter 11 cases it would be disruptive during the initial stages of these chapter 11 cases.  Accordingly, the Debtors seek authority to, among other things, continue use of business forms, including checks and letterheads.  The Debtors also propose that, when practicable after the Petition Date, they will indicate "Debtor in Possession" on their existing checks and business forms instead of having new checks issued with such markings.

65.     The relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, creditors, and other parties in interest.

## F.     Wages Motion

66.     The Debtors seek an order (i) authorizing the payment of prepetition wages and salaries and the payment and honoring of prepetition employee policies and benefits, and (ii) continuing employee wages and benefits during these chapter 11 cases.

67.     As of the Petition Date, the Debtors have seventy-eight (78) full-time employees and three (3) part-time employees.  In addition to their salary and compensation programs, the Debtors are obligated to pay and to provide certain medical, dental, vision, life, and disability insurance, and other related benefits to their employees, and the Debtors reimburse employees for ordinary business expenses incurred on behalf of the Debtors.

68.     While the Debtors do not believe there are outstanding prepetition employee wage, salary or benefit expenses, except with respect to certain expense reimbursement obligations, the Debtors nonetheless believe it is necessary to have any such amounts paid promptly after the Petition Date, and to continue such wages, salaries and benefits during these chapter 11 cases.  The Debtors depend on their employees to perform a variety of

critical functions inherent to the business. The employees' skills, their relationships with customers, licensors and licensees, and their specialized knowledge and understanding of the Debtors' operations are all essential to the Debtors' ability to continue operations and navigate the chapter 11 process.

69.     The relief requested in the Wages Motion is necessary to maintain the morale and loyalty of their workforce and maximize the value of the Debtors' estates.

## F.     **CUSTOMER PROGRAMS MOTION**

70.     The Customer Programs Motion seeks authority to  continue to honor certain prepetition obligations incurred in connection with the Debtors' customer programs, and to continue, renew, replace and/or terminate such programs and implement new programs in the ordinary course of business.

71.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors offered and engaged in certain customer programs to competitively sell their advertising inventory in the marketplace and to develop or enhance customer loyalty.  The Debtors' customer programs are comprised of the following:  (1) metric-based advertising sales with their advertising customers (the "Advertisers") pursuant to which the Debtors may incur liabilities to Advertisers related to the failure to achieve previously agreed upon viewer ratings for programs where advertisings are placed, and (2) bartering-based advertising arrangements pursuant to which the Debtors provide advertising time to Advertisers in exchange for various types of goods and services.

72.     The Debtors operate in a highly competitive industry with a finite customer base.  The Debtors compete with other television programmers and media providers for advertising revenue and such entities use similar programs as incentives for Advertisers.  The continued viability of the Debtors' advertising sales depends upon customer satisfaction and the

revenue and cost-saving attributes of the customer programs, and the Debtors' failure to honor prepetition obligations with respect to the customer programs would seriously impact the Debtors' ability to maintain their customer base during the chapter 11 cases.

## III.    LOCAL RULE 1007-2 DISCLOSURES

73.    Pursuant to Local Rule 1007-2 (a)(1), a statement regarding the nature of the Debtors' businesses and the circumstances leading to the filing of their chapter 11 petitions is set forth in Part I of this Declaration.

74.    These cases were not originally commenced under chapter 7 or chapter 13 of the Bankruptcy Code; accordingly, Local Rule 1007-2(a)(2) is inapplicable.

75.    No committee was organized prior to the filing of these chapter 11 cases; accordingly, Local Rule 1007-2(a)(3) is inapplicable.

76.    In accordance with Local Rule 1007-2(a)(4), Schedule A-4 lists the holders of the Debtors' unsecured claims on consolidated basis, excluding the claims of insiders. To the extent available, Schedule A-4 includes a list of the names and addresses of these creditors and the names, addresses, and telephone numbers of persons familiar with the Debtors' account.  When available, the amount of the claim is also included.  In each case, the claim amounts listed on Schedule A-4 are estimated, on a preliminary basis, and subject to verification. The Debtors reserve any and all rights (i) as to whether any claim is contingent, unliquidated, disputed or subject to setoff, (ii) to challenge the priority, nature, amount and status of any claim or debt, and (iii) to assert any remedies, defenses, counterclaims and offsets with respect to each of the foregoing.

77.    In accordance with Local Rule 1007-2(a)(5), the Debtors submit that, except with respect to the following disclosures, the Debtors have no secured creditors.  Under the terms of The CW-4Kids Entertainment Saturday Morning Programming Block Term Sheet,

dated June 23, 2010, The CW and 4Kids Entertainment have designated The Bank of New York Mellon ("BNYM") as paying agent to which proceeds derived from the sale of national advertising in The CW4Kids Block are paid. Each Friday, 4Kids Entertainment is remitted, on average, approximately $63,000 from the CW's account at BNYM in respect of 4Kids' share of the proceeds. The CW has a security interest in the account at BNYM. The Debtors reserve any and all rights as to the validity, enforceability and priority of any claim and/or lien, and reserve any and all rights to assert remedies, defenses, counterclaims and offsets with respect to any such claim or lien. In addition, Cannon Business Solutions has a security interest in certain copiers leased by 4Kids Entertainment for use in its business operations.

78. As required by Local Rule 1007-2(a)(6), the Debtors' books and records reflect assets and liabilities for the Debtors and their non-debtor affiliates on a consolidated basis as of March 31, 2011, approximately as follows:

Total Assets: $23,372,876

Total Liabilities: $16,526,746

79. In accordance with Local Rule 1007-2(a)(7), the Debtors represent that 4Kids Entertainment has issued common stock and that the common stock trades on an over-the-counter exchange. The Debtors estimate that, as of March 30, 2011, approximately 13.5 million shares of 4Kids Entertainment common stock are outstanding and are held by approximately 250 to 300 holders (as provided on the stock registrar).[7] In accordance with Local Rule 1007-2(a)(7), Schedule A-7 contains a list of the Debtors' officers and directors that hold 4Kids Entertainment common stock and the approximate amount of such holdings.

---

[7]     4Kids Entertainment holds approximately 2 million shares of its common stock as treasury stock.

80.     In response to Local Rule 1007-2(a)(8), Schedule A-8 contains a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address and telephone number of such entity.  The Debtors represent that there are no proceedings related to any of the above pending in any court.

81.     In accordance with Local Rule 1007-2(a)(9), the Debtors represent that they lease the following properties:  (i) 53 W. 23rd St., New York, NY 10010 (11th floor), and (ii) 53 W. 23rd St., New York, NY 10010 (part of the 6th floor).  The Debtors represent that they do not own any real property.

82.     In accordance with Local Rule 1007-2(a)(10), and as detailed on Schedule A-10 attached hereto, the Debtors disclose that their general books and records and day-to-day operating records are maintained at 53 W. 23rd St., New York, NY 10010.  The Debtors' substantial assets are located at the locations listed on Schedule A-10.

83.     In response to Local Rule 1007-2(a)(11), to the best of my knowledge, information, and belief, there are no actions or proceedings, pending or threatened against the Debtors or their property where a judgment or a seizure of property is imminent.

84.     As required by Local Rule 1007-2(a)(12), a list of the Debtors' existing senior management, including their tenure with the Debtors and a brief summary of their responsibilities and experience, is attached hereto as Schedule A-12.

85.     In accordance with Local Rule 1007-2(b)(1), the Debtors estimate that the payroll for employees, exclusive of officers, directors, stockholders and partners, for the thirty (30) days following the Petition Date, will be approximately $593,629 plus applicable taxes.[8]

---

[8]     The Debtors estimate that the payroll for employees of the Debtors' U.K. non-debtor affiliate, exclusive of officers, directors, stockholders and partners, for the 30 days following the Petition Date, will be

86.     In accordance with Local Rule 1007-2(b)(2)(A), the Debtors estimate that the amount to be paid to the Debtors' officers and directors for the thirty (30) days following the Petition Date will be approximately $170,833 plus applicable taxes.[9]

87.     In accordance with Local Rule 1007-2(b)(2)(C), no financial or business consultant has been retained by the Debtors.

88.     In accordance with Local Rule 1007-2(b)(3), set forth on <u>Schedule B-3</u> hereto are the estimated consolidated cash receipts, disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid for the thirty (30) days following the Petition Date, other than professional fees.

*[The remainder of this page has been left blank intentionally]*

---

approximately $26,411 plus applicable taxes.  These wages are being paid by a non-Debtor entity out of the operating funds of such entity.

[9]     The Debtors estimate that the payroll for officers and directors of the Debtors' U.K. non-debtor affiliate for the 30 days following the Petition Date will be $38,074.34 plus applicable taxes.  These wages are being paid by a non-Debtor entity out of the operating funds of such entity.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that this

Declaration is true and correct to the best of my knowledge, information, and belief.

Dated: April 6, 2011
      New York, New York

By: */s/ Bruce R. Foster*_____
     Bruce R. Foster
     Executive Vice President and Chief Financial
     Officer, 4Kids Entertainment, Inc., on behalf of
     the Debtors and Debtors in Possession

**Chart of Debtors' Corporate Structure**

# 4Kids Corporate Structure



4Kids Entertainment, Inc. (New York) (Tax I.D. 1380)

- 4Kids Entertainment International, Ltd. (U.K.)* (Tax I.D. 3342)
- 4Kids Entertainment Licensing, Inc. (New York) (Tax I.D. 3593)
- 4Kids Productions, Inc. (New York) (Tax I.D. 3593)
- The Summit Media Group, Inc. (New York) (Tax I.D. 2061)
- World Martial Arts Productions, Inc. (New York) (Tax I.D. 8492)
- 4Kids Websites, Inc. (Delaware) (Tax I.D. 7563)
- 4Kids Digital Games, Inc. (Delaware) (Tax I.D. 7645)
- 4Kids Entertainment Music, Inc. (Delaware) (Tax I.D. 6311)
- 4Kids Technology, Inc. (Delaware) (Tax I.D. 8181)
- 4Sight Licensing Solutions, Inc. (Delaware) (Tax I.D. 8897)
- 4Kids Ad Sales, Inc. (Delaware) (Tax I.D. 6309)
- 4Kids Entertainment Home Video, Inc. (Delaware) (Tax I.D. 0094)

55% Ownership — TC Websites LLC** (Delaware) (Tax I.D. 7645)

55% Ownership — TC Digital Games LLC** (Delaware) (Tax I.D. 9593)

\* 4Kids Entertainment International, Ltd. is a Non-Debtor affiliate.

\*\* Both TC Websites LLC and TC Digital Games LLC are Non-Debtor entities. Additionally, a 45% ownership interest in each of these entities is held by Chaotic USA Entertainment Group, Inc. ("Chaotic"). Chaotic is unaffiliated with the Debtors in these cases or the Debtors' non-Debtor affiliate.

## <u>Schedule A-4</u>

## <u>Schedule Regarding Holders of the Debtors' Unsecured Claims on a Consolidated Basis</u>

      Pursuant to Local Rule 1007-2(a)(4), attached hereto is a list of the Debtors' unsecured claims on a consolidated basis (the "<u>Unsecured List</u>").  The Unsecured List is based on the Debtors' books and records as of approximately the Petition Date.  The Unsecured List was prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Debtors' chapter 11 cases.  The Unsecured List does not include:  (1) persons who come within the definition of "<u>insider</u>" set forth in 11 U.S.C. §101(31), or (2) secured creditors.  The information presented in the Unsecured List shall not constitute an admission by the Debtors nor are they binding on the Debtors.  Any amounts listed herein are estimated, on a preliminary basis, and subject to verification.  The Debtors reserve any and all rights (i) as to whether any claim is contingent, unliquidated, disputed or subject to setoff, (ii) to challenge the priority, nature, amount and status of any claim or debt, and (iii) to assert any remedies, defenses, counterclaims and offsets with respect to each of the foregoing.

## Schedule A-4-1

## Schedule Regarding Holders of the Debtors' Unsecured Claims on a Consolidated Basis

| Name | Amount of Claim | Address | Phone Number | Description |
|------|-----------------|---------|--------------|-------------|
| THE POKEMON COMPANY INTERNATIONAL | $4,700,000.00 | 333 108TH AVENUE NE SUITE 1900 BELLEVUE, WA 98004 | 425-274-4855 | CONTRACT |
| ASATSU-DK, INC. | $4,221,626.36 | 13-1 TSUKUIJI 1-CHOME CHUO-KU, TOKYO JAPAN 104-8172 | 81-3-3547-2111 | CONTRACT |
| THE CW NETWORK, LLC | $1,987,000.00 | 3300 W. OLIVE AVENUE BURBANK, CA 91505 | 818-977-4692 | CONTRACT |
| HOME FOCUS DEVELOPMENT, LTD | $1,075,000.00 | C/O LOWENSTEIN SANDLER PC 1251 AVENUE OF THE AMERICAS NEW YORK, NY 10020 | 212-262-6700 | CONTRACT |
| JOHN MILITO | $113,521.16 | 3830 VALLEY CENTRE DRIVE SUITE 705-405 SAN DIEGO, CA 92130 | 858-442-9915 | CONTRACT |
| TWENTY THREE R.P. ASSOCIATES C/O ADAMS & COMPANY | $103,204.79 | TWENTY THREE R.P. ASSOCIATES C/O ADAMS & COMPANY | 212-679-5500 | REAL ESTATE |
| BRYAN GANNON | $80,000.00 | C/O CHAOTIC USA ENTERTAINMENT, INC. 12481 HIGH BLUFF DRIVE SUITE 201 SAN DIEGO, CA 92131 | 619-992-8219 | CONTRACT |
| JPMORGAN CHASE BANK NA | $67,887.13 | P.O. BOX 73661 CHICAGO, IL 60673-7761 | | CREDIT CARD |
| JONES DAY | $40,685.29 | P.O. BOX 70294 CLEVELAND, OHIO 44190 | 216-586-3939 | LAW FIRM |

| Name | Amount of Claim | Address | Phone Number | Description |
|---|---|---|---|---|
| THE PLATFORM | $38,541.75 | 15966 COLLECTIONS CENTER DRIVE CHICAGO, IL 60693 | 206-436-7900 | CONTRACT |
| CINEDIGM | $32,500.00 | CONTENT & ENT GROUP P.O. BOX 26606 NEW YORK, NY 10087 | 818-587-4880 | CONTRACT |
| COMMUNICATION BY DESIGN | $28,802.00 | COMMUNICATION BY DESIGN | +44 (0) 20 7729 4000 | VENDOR |
| ADVANSTAR COMMUNICATIONS | $23,462.50 | 131 W. FIRST STREET DULUTH, MN 55802 | 818-227-4057 | CONTRACT |
| PM CONTRACTING COMPANY, LLC | $8,000.00 | 40 EXCHANGE PLACE 19TH FLOOR NEW YORK, NY 10005 | 212-785-8080 | CONTRACT |
| WORLDSCREEN | $7,500.00 | 1123 BROADWAY SUITE 1207 NEW YORK, NY 10010 | 212-924-7260 | VENDOR |
| TSAR & TSAI | $4,956.70 | 245 DUNHUA S. ROAD SEC 1 TAIPEI 106 TAIWAN R.O.C | (02) 2781-4111 | LAW FIRM |
| DUN & BRADSTREET | $4,413.12 | P.O. BOX 75434 CHICAGO, IL 60675-5434 | 800-234-3867 | CONTRACT |
| IT LAW GROUP | $4,234.34 | 555 BRYAN STREET #603 PALO ALTO, CA 94301 | 650-804-1235 | LAW FIRM |
| DONNELLY MECHANICAL CORP | $4,137.25 | 96-59 222ND STREET QUEENS VILLAGE, NY 11429 | 718-886-0446 | VENDOR |
| COFFEE DISTRIBUTION CORP. | $3,139.85 | 200 BROADWAY P.O. BOX 766 NEW HYDE PARK, NY 516-746-7010 | 516-746-7010 | VENDOR |
| NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE | $3,023.30 | BANKRUPTCY SECTION PO BOX 5300 ALBANY, NY 12205 | | TAX LIEN |

| Name | Amount of Claim | Address | Phone Number | Description |
|---|---|---|---|---|
| IRON MOUNTAIN RECORDS MGMNT | $2,763.95 | P.O. BOX 27128 NEW YORK, NY 10087-7128 | 770-239-9200 | VENDOR |
| FEDERAL EXPRESS | $2,457.80 | P.O. BOX 371461 PITTSBURG, PA 15250 | 800-463-3339 | VENDOR |
| EMPLOYMENT DEVELOPMENT DEPT. | $2,360.92 | P.O. BOX 826846 SACRAMENTO, CA 94246-0001 | 866-564-4228 | CONTRACT |
| W.B. MASON CO., INC. | $2,148.53 | P.O. BOX 55840 BOSTON, MA 02205-5840 | 800-242-5892 | VENDOR |
| KILBURN & STRODE | $2,123.59 | 20 RED LION STREET LONDON WC1R4PJ | +44 (0)20-7539 4200 | LAW FIRM |
| VERIZON BUSINESS | $1,662.92 | P.O. BOX 382040 PITTSBURGH, PA 15251 | 800-234-1000 | VENDOR |
| DGA SECURITY SYSTEMS, INC. | $1,595.69 | 20 W. 47TH STREET NEW YORK, NY 10036 | 212-840-5153 | VENDOR |
| STAPLES BUSINESS ADVANTAGE DEPT. | $1,250.90 | P.O. BOX 415256 BOSTON, MA 02241-5256 | 800-828-9949 | VENDOR |
| DIAL CAR INC. | $1,076.43 | 2104 AVENUE X BROOKLYN, NY 11235 | 718-743-8383 | VENDOR |
| CORPORATE COFFEE | $1,052.60 | 745 SUMMA AVENUE WESTBURY, NY 11590 | 800-284-CORP | VENDOR |
| JAGUAR CONSULTING, INC. | $1,000.00 | 117 E. COLORADO BLVD SUITE 225 PASADENA, CA 91105 | 626-796-1955 | CONSULTING SERVICES |
| IRON MOUNTAIN | $937.40 | P.O. BOX 27129 NEW YORK, NY 10087-7129 | | VENDOR |
| SDI MEDIA USA, INC. | $800.00 | 10950 WASHINGTON BLVD., STUDIO B CULVER CITY, CA 90232 | 310-388-8800 | VENDOR |

| Name | Amount of Claim | Address | Phone Number | Description |
|---|---|---|---|---|
| EATON CORPORATION | $519.38 | P.O. BOX 93531 CHICAGO, IL 60673 | 412-893-3662 | VENDOR |
| MACO OFFICE SUPPLIES | $348.29 | P.O. BOX 8067 UNION CITY, NJ 07087 | 201-867-3309 | VENDOR |
| VERIZON CONFERENCE | $331.01 | P.O. BOX 371838 PITTSBURGH, PA 15251 | 800-475-0600 | VENDOR |
| TERMINIX | $90.37 | P.O. BOX 742592 CINCINNATI, OH 45274 | 800-TERMINIX | VENDOR |
| SECURESHRED LLC | $87.10 | 55 TOLEDO STREET S. FARMINGDALE, NY 11735 | 631-777-1330 | VENDOR |

## Schedule A-7

## Schedule Regarding Directors' and Officers' Holdings of Common Stock

Pursuant to Local Rule 1007-2(a)(7), the following is a schedule of common stock of 4Kids Entertainment held by the Debtors' officers and directors.

| Name of Officer or Director | Total Held | Percentage of Shares Outstanding |
|---|---|---|
| Duminda DeSilva-Director (held by Prescott Group Capital Management LLC) | 2,414,209 shares | 17.84% |
| Wade I. Massad-Director (37,200 held personally and 617,100 held by Cleveland Capital Management LLC) | 654,300 shares | 4.9% |
| Jay Emmett-Director | 45,300 shares and 15,000 options | Less than 1% |
| Michael Goldstein-Director | 43,000 shares and 15,000 options | Less than 1% |
| Samuel Newborn-Executive Vice President and General Counsel | 49,103 shares and 30,000 options | Less than 1% |
| Bruce Foster-Executive Vice President and Chief Financial Officer | 47,751 shares and 25,000 options | Less than 1% |
| Brian Lacey-Executive Vice President | 30,191 shares and 25,000 options | Less than 1% |

## Schedule A-8

## List of Debtors' Property in the Possession of Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following schedule lists property of the Debtors in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or any agent for any such entity. The Debtors are working to confirm that no other such party is in possession of any of the Debtors' property and reserve the right to supplement this schedule if additional property is identified. The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt and to assert any remedies, defenses, counterclaims and offsets with respect to each of the foregoing.

To the best of the Debtors' knowledge, none of their property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or any agent for any such entity, other than, if any:

(i)     The Bank of New York Mellon as Paying Agent pursuant to The CW Network, LLC-4Kids Entertainment, Inc. Saturday Morning Programming Block Term Sheet, dated June 23, 2010;

(ii)     bond posted with HCC Surety Group in the amount of $113,521.16 in respect of an appeal from a decision of the Labor Commission of the State of California in the matter of John Milito v. TC Digital Games LLC and 4Kids Entertainment, Inc. (10-73320);

(iii)     deposits with Adams & Co Real Estate LLC, Producer's Payroll, Inc. and Advanstar Communications; and

(iv)     to the extent applicable, retainers held by various professionals employed by the Debtors, including Kaye Scholer LLP, Epiq Bankruptcy Solutions, LLC and Eiseman Levine Lehrhaupt & Kakoyiannis, P.C.

**Schedule A-8-1**

**List of Debtors' Property in the Possession of Third Parties**

| Vendor | Amount | Address | Phone Number | Description |
|---|---|---|---|---|
| HCC Surety Group | $113,521.16 | 625 The City Drive South, Suite 130 Orange, CA 92868 | (714) 740-7000 | Appeal Bond |
| Eiseman Levine Lehrhaupt & Kakoyiannis, P.C. | $10,080.79 | 805 3rd Avenue New York, NY 10022 | (212) 752-1000 | Retainer |
| Kaye Scholer LLP | Estimated to be $250,000 | 425 Park Avenue New York, NY 10022 | (212) 836-8000 | Retainer |
| Epiq Bankruptcy Solutions, LLC | Estimated to be $20,000 | 757 Third Avenue, Third Floor New York, NY 10017 | (646) 282-2500 | Retainer |
| Adams & Co. Real Estate LLC | $135,357.38 | 411 5th Avenue New York, NY 10016 | (212) 679-5500 | Deposit |
| Producer's Payroll, Inc. | $110,000.00 | 500 South Sepulveda Los Angeles, CA 90049 | (310) 440-9600 | Deposit |
| Advanstar Communications | $72,787.50 | 131 W First Street, Duluth, MN 55802 | (218) 740-7200 | Deposit |

## Schedule A-10

### Location of Debtors' Substantial Assets and Books and Records and
### Nature, Location and Value of Assets Held Outside the United States

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside of the territorial limits of the United States.

Location of Debtors' Substantial Assets

The Debtors' substantial assets include rights under certain license and broadcast agreements; certain leased properties as described herein; furniture, fixtures, and equipment located at those leased properties; bank accounts; and certain investment receivables. The Debtors' substantial assets are located in the state of New York.

Books and Records

The books and records for all Debtors are maintained at 53 W. 23rd St., New York, NY 10010.

Nature, Location, and Value of Debtors' Assets Outside the United States

None of the Debtors' assets are located outside of the United States.

**Schedule A-12**

**Schedule of Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following table sets forth the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experiences, including their tenure.

| Person | Position | Brief summary of Responsibilities and Experience |
|--------|----------|--------------------------------------------------|
| Bruce R. Foster | Executive Vice President and Chief Financial Officer | Bruce R. Foster has been the Chief Financial Officer and Executive Vice President of 4Kids since December 2005. Prior thereto, Mr. Foster had served as the Senior Vice President of Finance since joining 4Kids in August 2002. From 1998 to 2002, Mr. Foster held various positions with Deloitte & Touche LLP, an international public accounting firm, most recently as an Audit Director. |
| Samuel R. Newborn | Executive Vice President and General Counsel | Samuel R. Newborn, Esq. has been a director of 4Kids since 2005 and Executive Vice President and General Counsel since January 2000. Prior to joining 4Kids in 2000, Mr. Newborn was a partner in the law firm of Janklow, Newborn & Ashley for more than five years. |
| Brian Lacey | Executive Vice President, International | Brian Lacey has been Executive Vice President of International for 4Kids since July 2003. Prior to joining 4Kids, Mr. Lacey was the President and founder of Lacey Entertainment, a New York-based worldwide television marketing, production, and distribution company, specializing in innovative and creative approaches in the packaging, production and launching of television series in the U.S. and around the world. Prior to forming Lacey Entertainment, he was co-founder and principal of Zodiac Entertainment, a television program and marketing co-venture formed with Central Independent Television of the UK (now Carlton Television). |
| Daniel Barnathan | President, 4Kids Ad Sales, Inc. | Daniel Barnathan has been President of 4Kids Ad Sales, Inc. since May 2006. Prior to such time, Mr. Barnathan served as Executive Vice President of Sales, Marketing and Promotions of 4Kids Ad Sales, Inc. since 2001. Prior to 2001, Mr. Barnathan worked at ABC-TV for more than 23 years in various positions such as Senior Vice President of ABC-TV/Disney Kids Network and senior management positions in the sales and marketing departments of the children's, daytime and news day-parts at the ABC-TV Network. From 2001 to 2002, Mr. Barnathan served as Executive Vice President of Sales and Marketing at CBS HealthWatch/Medscape, an online health information network. |

<u>Schedule B-3</u>

**Schedule of 30-Day Estimated Cash Receipts and Disbursements**
**Net Cash Gain or Loss, and Accrued Obligations and Receivables**
**(<u>Excluding Professional Fees</u>)**

   Pursuant to Local Rule 1007-2(b)(3), the following schedule provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the Debtors on a consolidated basis (these figures do not include the Debtors' non-debtor affiliates):

| Category | Estimated Amount for the 30-day period following the Petition Date |
|---|---|
| Cash Receipts | $1,157,061 |
| Cash Disbursements | $1,695,413 |
| Net Cash Gain or Loss | $0 |
| Unpaid Obligations | $202,564 |
| Unpaid Receivables | $129,821 |